IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

JOHN ELLIE TONEY,                    )
                                     )
            Plaintiff,               )
                                     )
      v.                             )          CIVIL ACTION NO. 2:03CV1233-T
                                     )
MONTGOMERY JOB CORPS, et al.,        )
                                     )
            Defendant.               )

## RECOMMENDATION OF THE MAGISTRATE JUDGE

Plaintiff John Ellie Toney, proceeding *pro se*, brings this action against defendants Montgomery Job Corps, Dynamic Educational Systems, Inc., and Mary L. Watts, alleging that defendants discriminated against him on the basis of his gender in violation of Title VII of the Civil Rights Act of 1964 when it terminated his employment, denied him an opportunity for advancement, and subjected him to disparate working conditions. (Complaint, ¶¶ 3-4, 9). This action is presently before the court on the motion for summary judgment filed by defendants on April 5, 2005 (Doc. # 100). Upon consideration of the motion, the court concludes that it is due to be granted.

## THE SUMMARY JUDGMENT STANDARD

A party seeking summary judgment bears the initial burden of demonstrating to the court the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions that it believes show an absence of any genuine issue of material fact. <u>Hairston v. Gainesville Publishing Co.</u>, 9 F.3d 913 (11th Cir. 1993).

In Celotex Corp. v. Catrett, 477 U.S. 317 (1986), the Court held that if a party opposing summary judgment "fails to make a showing sufficient to establish the existence of an element essential to their party's case, and on which their party will bear the burden of proof at trial," summary judgment shall be granted.

> [W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue . . . Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial. . . We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment. . . . Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56 except the mere pleadings themselves. . . ."

Id. at 324.

For summary judgment purposes, an issue of fact is "material" if it is a legal element of the claim, as identified by the substantive law governing the case, such that its presence or absence might affect the outcome of the suit.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party.  Matsushita Electrical Industrial Company v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  The court must view the evidence, and all factual inferences properly drawn from the evidence, in the light most favorable to the nonmoving party.  Welch v. Celotex Corp., 951 F.2d 1235, 1237 (11th Cir. 1992); Rollins v. TechSouth, Inc., 833 F.2d 1525, 1528 (11th Cir. 1987).  It is improper for this court to weigh conflicting evidence or make credibility determinations; instead, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn

in his favor." <u>Anderson</u>, 477 U.S. at 255.  Where a reasonable fact finder may "draw more than one inference from the facts, and that inference creates a genuine issue of material fact, then the court should refuse to grant summary judgment."  <u>Barfield v. Brierton</u>, 883 F.2d 923, 933-34 (11th Cir. 1989) (citation omitted).

## EXCLUSION OF EVIDENCE

Summary judgment procedure is governed by Rule 56 of the Federal Rules of Civil Procedure.  In an order entered on May 19, 2004, the parties were reminded of the requirements of the rule as follows:

In responding to a motion for summary judgment, the parties should make specific reference to the following provisions of Rule 56(e), Federal Rules of Civil Procedure:

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided for in this rule, must set forth specific facts showing that there is a genuine issue for trial.

A party opposing a motion for summary judgment cannot rely only on his unsworn pleadings but must oppose the motion by filing sworn affidavits, depositions, or answers to interrogatories that set forth specific facts which demonstrate that there is a genuine issue of material fact for trial in this case. Failure to file sworn affidavits or other acceptable evidence as set forth in Rule 56(e) may result in this court accepting the moving party's evidence as the truth. If documents are referred to in the opposing affidavits and have not been previously filed with the court, sworn or certified copies of those papers must be attached to the affidavits or served with them.

Failure to follow the requirements of Rule 56 regarding the proper way to oppose a motion for summary judgment may result in a recommendation of the Magistrate Judge that the motion be granted and that final judgment be entered in favor of the moving party without an evidentiary hearing.

3

(Doc. # 38)(footnotes omitted).  In an order entered on November 12, 2004, plaintiff was directed to refer to this order and to Rule 56 (e) of the Federal Rules of Civil Procedure regarding the proper manner in which to respond to summary judgment.  (Doc. # 84, p. 5). On March 21, 2005, plaintiff was once again directed to refer to the previous order and to Rule 56(e) with regard to responding to a motion for summary judgment.  (Doc. # 99, p. 3).[1]

Despite these admonitions from the court, and the requirements of Rule 56(e) regarding the type of evidence required to oppose a motion for summary judgment, plaintiff has filed a significant number of documentary exhibits that are not sworn or certified. Defendants have filed documents suffering from this same deficiency. The court has expended considerable effort to determine which of the parties' numerous exhibits are authenticated by depositions or affidavits of record.  Where the court has been able to determine that a documentary exhibit is authenticated to *any* extent by deposition or affidavit testimony, it has considered the exhibit.  However, the court has excluded from consideration any documents as to which it has been unable to draw such a conclusion.[2]  Thus, the court declines to consider Defendants' Exhibits 1, 15, 29, 30, 31, 33-35, 38, 56, and 59 and Plaintiff's Exhibits 3, 8, 11-13, 15-21, 27, 29, 31, 33, 35, 37-40, 46, 47, 49, 51 (pages 2-8

---

[1]  In this order allowing plaintiff an additional opportunity to respond, the court specifically noted that plaintiff had failed – in his previous submissions – to include his own affidavit testimony. (Doc. # 99, p. 2).

[2]  The court notes that even if it were to consider the excluded documents, the outcome of the present motion would not change.  The court has reviewed all of the exhibits filed by the parties. Even where the court is able to determine the source or nature of some of plaintiff's exhibits, the lack of any testimony regarding the significance of many of the documents has rendered the court unable to determine how these documents are relevant to the issues before the court.

only), 52-67, 70-72, 74-79, 81, and 85-89.

## BACKGROUND

Plaintiff John Toney was employed by defendant Dynamic Education Systems, Inc. as a shift coordinator at the Montgomery Job Corps Center from April 2002 until October 2003, when his employment was terminated.   Defendant Mary Watts was plaintiff's supervisor.  As the prime shift (3:00 p.m. to midnight) coordinator, plaintiff was responsible for supervising a number of "ILAs" – independent living advisors – who worked on his shift. Plaintiff and the ILAs were responsible for working with the students who resided in the dormitories at the Center.

During his tenure as prime shift coordinator, plaintiff received a number of memoranda from Watts relating to various aspects of his job responsibilities.  Some of these memoranda were addressed to plaintiff only, while others were addressed to plaintiff and other shift coordinators.   (See Watts aff. referencing memos).  According to plaintiff's testimony, Watts "always sends memos whether there's an issue – need for it or not," and that she "routinely send memos that doesn't really have any relevance to an issue."  (Toney depo., pp. 134-35).

Watts issued memoranda or notes addressed to plaintiff and one or more other shift coordinators providing reminders regarding student evaluations, time sheets, and behavior incident reports (Defendants' Exhibits 4, 36, 43) and expressing concerns regarding, *inter alia*, health and safety inspections not being conducted regularly, unsatisfactory facility standards, and failure of staff to complete "secondary mentoring program" forms

(Defendants' Exhibits 3, 6, 23).  In addition, some of Watts' memoranda and notes were directed to plaintiff alone indicating problems with incomplete behavior reports submitted by plaintiff's staff; problems with student transportation on plaintiff's shift; plaintiff's failure to communicate with another shift coordinator regarding a projected staff member's absence as directed by Watts; the failure of ILAs to submit documentation of health and safety inspections, focus group sessions, and minutes of weekly dorm meetings; and inequitable assignment of staff resources (Defendants' Exhibits 5, 13, 14, 16, 20; see also Defendants' Exhibit 8, January 2003 written complaint from C. Pearson to Watts regarding inequitable work assignments, lack of organization in transportation scheduling, and untimely communication to ILAs).

In her affidavit, Watts states that in February 2003 plaintiff took candy from a student, refused to return it, and ate it in front of the student "[a]pparently . . . in a taunting manner." She further states that "[a]fter being confronted by [Watts] and discussing the issue, Mr. Toney agreed to reimburse the student for the candy."  (Watts aff., p. 2; see also Defendants' Exhibits 9-12, statements from staff and students regarding incident).

In May 2003, Watts issued plaintiff a written disciplinary warning  stating that:

> On Sunday, May 11, 2003, you exhibited unprofessional conduct by engaging in a verbal fight with a subordinate.  This heated exchange started in the Social Development office and spilled over into the Recreation Center when my efforts failed to get the . . .two of you to calm down.  Once in the recreation center, you continued this . . . inappropriate exchange in front of students. Although asked several times to leave the area you walked away & returned two times to continue the argument.

(Defendants' Exhibit 17).   That same month, Watts received a written complaint from

another employee alleging that: (1) plaintiff failed to ensure that the floor in the girls' dormitory was properly stripped and cleaned so that the employee (who had come in on overtime) could wax the floor; (2) plaintiff failed to relieve this employee and another so that they could take their lunch break; and (3) plaintiff yelled at him and hung up on him. (Watts' aff., p. 3; Defendants' Exhibit 18).

In August 2003, Watts placed plaintiff on a 45-day performance improvement plan, identifying three "deficiency areas": (1) "Organization, effective planning and consistent follow through are lacking;" (2) "Frequently pertinent information is not shared correctly or at all with staff and supervision. Often communication is not clear;" and (3) "Judgement and effective and equitable use of staff resources." The plan also identified required corrective actions. (Defendants' Exhibit 21). In a memorandum dated September 19, 2003, Watts provides a summary of "positive areas" and "growth areas" she identified in meetings held with plaintiff on August 8 and September 2, 9, and 16. (Defendants' Exhibit 22).

On September 29, 2003, one of plaintiff's subordinates submitted a written complaint alleging that plaintiff had directed her to do a new student orientation when she did not have adequate training to do so and that he had made false representations to the subordinate regarding a student's complaint. (Watts' aff., p. 3; Defendants' Exhibit 24).

On October 6, 2003, Watts recommended to Eddie Williams (the Center Director) and Kimberly Skipper (Human Resources Manager) that plaintiff be terminated. Watts asserted that deficiencies remained in the areas identified in the performance improvement plan and set forth specific examples of problems she perceived in these areas. (Defendants' Exhibits

7

25, 26; Watts aff.; Skipper aff.; Williams aff.).  According to Watts, plaintiff was terminated because of the problems identified above, as well as "ongoing performance issues."  She asserts that plaintiff continued to demonstrate problems in the areas of "organization, planning, and follow through, judgment and effective and equitable use of staff resources, and effective communication and relations."  (Watts aff., p. 4).

## DISCUSSION

### Individual Defendant

Plaintiff brings all of his claims in this action pursuant to Title VII of the Civil Rights Act of 1964.  (See Complaint).  In addition to his employer, plaintiff sues his former supervisor, Mary L. Watts.  However, "'[t]he relief granted under Title VII is against the employer, not individual employees whose actions would constitute a violation of the Act.'" Hinson v. Clinch County, Georgia Board of Education, 231 F.3d 821, 827 (11th Cir. 2000)(quoting Busby v. City of Orlando, 931 F.2d 764, 772 (11th Cir. 1991)); Smith v. Lomax, 45 F.3d 402, 403 n. 4 (11th Cir. 1995).  Thus, plaintiff's claims against Watts in her individual capacity are due to be dismissed.  Additionally, to the extent plaintiff brings claims against Watts in her capacity as an agent of her employer, the claims are redundant to plaintiff's claims against the employer and, thus, are likewise due to be dismissed. Cf. Busby, *supra*, 931 F.2d at 776 (affirming directed verdict on § 1983 claims in favor of official capacity defendants because those claims were rendered redundant by presence of employer as a defendant).

8

### Analytical Framework

In order to establish a case under Title VII, a plaintiff may use three different kinds of evidence of discriminatory intent: direct evidence, circumstantial evidence or statistical evidence.  The analytical framework and burden of production varies depending on the method of proof chosen.  If a plaintiff can provide direct evidence of discriminatory intent, then the employer must prove by a preponderance of the evidence that the same employment decision would have been made in the absence of the discriminatory intent.

\* \* \* \* \*

Direct evidence is evidence that establishes the existence of discriminatory intent behind the employment decision without any inference or presumption.  Therefore, remarks by non-decisionmakers or remarks unrelated to the decisionmaking process itself are not direct evidence of discrimination.

Standard v. A.B.E.L. Services, Inc., 161 F.3d 1318, 1330 (11th Cir. 1998)(citations omitted).

"[O]nly the most blatant remarks, whose intent could be nothing other than to discriminate . . . constitute direct evidence of discrimination." One example of direct evidence would be a management memorandum saying, "Fire Earley--he is too old."

Earley v. Champion International Corp., 907 F.2d 1077, 1081-82 (11th Cir. 1990)(citations omitted); see also Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1086 (11th Cir. 2004)("If the alleged statement suggests, but does not prove, a discriminatory motive, then it is circumstantial evidence."); Jones v. Bessemer Carraway Medical Center, 151 F.3d 1321, 1322 n. 11 (11th Cir. 1998)("[D]irect evidence of discrimination is powerful evidence capable of making out a *prima facie* case essentially by itself.  This court has marked severe limits for the kind of language to be treated as direct evidence of discrimination.  To give great weight . . . to language that is, at best, only circumstantial evidence blurs the important distinction between circumstantial evidence and direct evidence for *prima facie* cases.

9

Blurring this distinction adds hurtful uncertainty to the law.  Language not amounting to direct evidence, but showing some racial animus, may be significant evidence of pretext once a plaintiff has set out the *prima facie* case.")(citations omitted).

Plaintiff has filed evidence that Watts[3] stated to James Gooden – a Center employee who worked under Watts supervision before she became plaintiff's supervisor – that "she was not going to allow anyone to run over her because she was a strong, independent black woman," and that she told another male manager that she "didn't need a male to do anything for her and that women rule."  (Gooden aff., p. 1).[4]  Gooden does not indicate when these statements were made, and there is no evidence that they related to the plaintiff or to the employment actions at issue in this case.  The two statements related by Gooden are not direct evidence of discrimination.

Additionally, plaintiff testified that Watts told him that "she was a strong, independent black woman in a position of authority and [plaintiff] couldn't handle it."  (Toney depo., p. 349).  Construing plaintiff's deposition testimony in the light most favorable to him, the latter

---

[3]  Watts "recommended" plaintiff's termination to Williams, the Center Director, and Skipper, the Human Resources manager.  It does not appear from the record that Williams conducted an independent investigation of the merits of the recommendation, and Skipper's investigation consisted of a document review and conversations with Watts and plaintiff.  In the absence of clear evidence regarding who actually had final authority with respect to the decision to fire plaintiff,  the court treats Watts as a decisionmaker with respect to that employment action. Cf. Stimpson v. City of Tuscaloosa, 186 F.3d 1328 (11th Cir. 1999).

[4]  It is not clear from the language of the affidavit whether Gooden himself overheard the latter statement or whether it was relayed to him by the "male manager" – in which case it would be inadmissible hearsay.  For purposes of this motion, viewing Gooden's testimony in the light most favorable to plaintiff, the court infers that Gooden overheard the statement.

10

comment was made when Watts first placed plaintiff on the performance improvement plan. (Toney depo., pp. 348-49). Even so, it does not meet the "rigorous standard" for direct evidence of discrimination. See Damon v. Fleming Supermarkets of Florida, Inc., 196 F.3d 1354, 1358-59 (11th Cir. 1999); compare Watts' statement with statement in Akouri v. State of Florida Dept. of Transportation, 408 F.3d 1338, 1347-48 (11th Cir. 2005). Assuming that Watts' statement to plaintiff "suggests" a discriminatory motive, it is clear that it does not prove one. It is not, therefore, direct evidence of discrimination.

The McDonnell Douglas/Burdine[5] framework was established by the Supreme Court for evaluating a Title VII plaintiff's claims of discrimination against an employer where, as here, there is no direct evidence of discrimination. See Combs v. Plantation Patterns, 106 F.3d 1519, 1527-28 (11th Cir. 1997). The plaintiff must first make out a *prima facie* case of discrimination. Burdine, 450 U.S. at 252-53; Walker v. Mortham, 158 F.3d 1177, 1183 (11th Cir.1998); Combs, 106 F.3d at 1527-28. "Establishment of the *prima facie* case in effect creates a presumption that the employer unlawfully discriminated against the employee. If the trier of fact believes the plaintiff's evidence, and if the employer is silent in the face of the presumption, the court must enter judgment for the plaintiff because no issue of fact remains in the case." Id. (quoting Burdine, 450 U.S. at 254); Walker, *supra*.

If the plaintiff establishes a *prima facie* case, the employer has the burden of producing "legitimate, non-discriminatory reasons for the challenged employment action."

---

[5]   McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); Texas Department of Community Affairs v. Burdine, 450 U.S. 248 (1981).

Combs, 106 F.3d at 1528 (citing McDonnell Douglas, 411 U.S. at 802). "To satisfy this intermediate burden, the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." Combs, 106 F.3d at 1528 (quoting Burdine, 450 U.S. at 257). If the employer articulates a legitimate, nondiscriminatory reason for its decision, the mandatory inference of discrimination arising from the *prima facie* case is destroyed. Walker, 158 F.3d at 1184. The plaintiff must then produce evidence "including the previously produced evidence establishing the *prima facie* case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." Combs, 106 F.3d at 1528. Defendant contends that plaintiff can establish neither a *prima facie* case of discrimination with regard to the employment actions at issue nor pretext.

### *Prima Facie* Case

#### Opportunities for Advancement

Plaintiff complains that defendants denied him opportunities for advancement. (Complaint, ¶ 9). In his affidavit, he identifies two specific positions for which he was rejected: (1) the position of shift coordinator for night shift; and (2) a Warehouse Specialist position. The evidence of record is sparse with regard to both of these opportunities. As to the former, plaintiff states:

> In the month of May 2003, I applied for the night shift coo[r]dinator position, after Ms. Yvette Hall relocated to New York. Ms. Watts denied my application and gave the position to Ms. Elizanne Hayes, who did not apply for

the position and did not want the position.  I was qualified for the position.

(Toney aff., p. 5).  Defendant has filed the affidavit testimony of Barbara Woodman, Human

Resources Director for defendant Dynamic Educational Systems, Inc.  Woodman states:

> Mr. Toney requested a shift change to the night shift Independent Living Advisor Coordinator position from the prime shift coordinator position . . . .  Movement of an Independent Living Advisor Coordinator from one shift to another does not constitute a promotion or a transfer, it is a shift change.

(Woodman aff.).

To prevail on a claim of discrimination under Title VII, plaintiff must "establish as

part of his *prima facie* case, that he suffered so-called 'adverse employment action.'" Davis

v. Town of Lake Park, Florida, 245 F.3d 1232, 1238 (11th Cir. 2001).

> [T]o support a claim under Title VII's anti-discrimination clause the employer's action must impact the 'terms, conditions, or privileges' of the plaintiff's job in a real and demonstrable way.  Although the statute does not require proof of direct economic consequences in all cases, the asserted impact cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment.  We therefore hold that, to prove adverse employment action in a case under Title VII's anti-discrimination clause, an employee must show a *serious and material* change in the terms, conditions, or privileges of employment.  Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances.

Id. at 1239.  The court accepts that – under some circumstances – a shift change can

constitute an actionable adverse action and, further, that refusing an employee's request for

a shift change could also constitute an adverse action.  However, plaintiff has pointed to no

evidence demonstrating that he has, in this case, suffered an adverse action by reason of the

denial of his request to transfer to the night shift. There is no evidence in the record that the position of night shift coordinator was considered to be more prestigious in any way than the prime shift coordinator position, or that it involved any pay differential or other increase in benefits. Plaintiff has not demonstrated that Watts' refusal to transfer plaintiff to a different shift constituted either a denial of promotion or a serious and material action affecting the terms and conditions of his employment. Gonzalez v. Florida Dept of Highway Safety and Motor Vehicles, 237 F. Supp. 2d 1338, 1348 (S.D. Fla. 2002)(denial of plaintiff's request to transfer to the morning shift did not constitute an adverse employment action where plaintiff did not allege that shift change would "represent an increase in pay, prestige or responsibility"), *affirmed*, 45 Fed. Appx. 886 (11th Cir. 2002); Cf. Allen v. U.S. Postmaster General, 2005 WL 3340136 (11th Cir. Dec. 9, 2005)(unpublished opinion)("[A]llen can only complain of a change in shift and having to drive farther to work, which are not adverse employment actions."); Benefield v. Fulton County, Georgia, 130 Fed. Appx. 308 (11th Cir. 2005)(unpublished opinion)(lateral transfer of fire department employee from the headquarters office to a fire station constituted a change in work assignment instead of adverse employment action sufficient to support Title VII retaliation claim); Benningfield v. City of Houston, 157 F.3d 369, 377 (5th Cir. 1998)(In a First Amendment retaliation case, stating "Benningfield maintains that transferring her to the night shift constituted an adverse employment action. Merely changing Benningfield's hours, without more, does not constitute an adverse employment action."). Thus, plaintiff has failed to establish a *prima facie* case of discrimination with regard to Watts' refusal to transfer plaintiff to the night

shift.

      With regard to the Warehouse Specialist position, plaintiff states:

      On April 23, 200[3], I applied for the Warehouse Specialist position.  Ms. Watts signed on the form for me to interview for the position because a supervisor's signature was required.  After I interviewed for the position, I was told by the interviewer that I was qualified for the position and would more than likely be selected, but Ms. Watts went to H.R. and blocked H.R. from offering me the position.

(Toney aff., p. 5; see Plaintiff's Exhibit 50).[6]  As with the night shift coordinator position, plaintiff has not directed the court to competent evidence of record that the Warehouse Specialist position actually constituted a promotion or was otherwise superior to the position he held.  Additionally, plaintiff has not demonstrated either that the position was filled by a female, or that the position remained open while defendant sought additional applicants with plaintiff's qualifications from outside of plaintiff's protected class.  Thus, plaintiff has not established a *prima facie* case of discrimination with regard to his nonselection for the position of Warehouse Specialist.

<u>Termination</u>

      "A plaintiff does not shift the burden to the defendant under <u>McDonnell Douglas</u> merely by stating that he was fired or treated unfavorably."  <u>Morris v. Emory Clinic, Inc.</u>, 402 F.3d 1076, 1082 (11th Cir. 2005).  Rather, he must "establish a *prima facie* case which

---

    [6]  Plaintiff's affidavit does not establish that he has personal knowledge regarding the information in the latter part of this statement – *i.e.*, that "Ms. Watts went to H.R. and blocked H.R. from offering me the position."  To the extent plaintiff's affidavit could be read to indicate that plaintiff was told this by the interviewer, it is hearsay.  Thus, the court does not consider this statement regarding Watts blocking the offer.

includes identifying an individual who replaced him or was treated better than he was who was not a member of his protected class . . . ."  Id.

It is undisputed that, after plaintiff was terminated, he was replaced by a male. Defendant argues that this fact alone precludes plaintiff from establishing a *prima facie* case of discrimination with respect to his termination.  However, in lieu of showing that he was replaced by a person outside his protected class, a plaintiff alleging discriminatory termination may instead establish a *prima facie* case of discriminatory termination by showing that "his employer treated similarly situated employees outside his classification more favorably . . . ."  Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997); see also Morris, *supra*.

Plaintiff has identified two female comparators, Elizanne Hayes and Daphne Wilson. Plaintiff states:

> All three of us had the same job title (Shift Coordinator), all three of us worked in Social Development, all three of us reported directly to Ms. Watts, all three of us supervised a shift, and all three of us had the same job duties and responsibilities, which made us similarly situated.

(Plaintiff's affidavit, p. 1; Toney depo., p. 36).  Hayes was the weekend shift coordinator until she moved to the night shift;[7] Wilson was then hired to replace Hayes as the weekend shift coordinator.  (Toney depo., pp. 37-39).  However, demonstrating that he was similarly situated to Wilson and Hayes requires plaintiff to establish more than that they shared the

---

[7] According to plaintiff's affidavit, the night shift coordinator position became available and Hayes was moved to night shift in May 2003.  (Toney aff.., p. 5).

same supervisor and job responsibilities.  "To make a comparison of the plaintiff's treatment to that of [female] employees, the plaintiff must show that he and the employees are similarly situated in all relevant respects. . . . In determining whether employees are similarly situated for purposes of establishing a *prima facie* case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways."  Holifield, *supra*, 115 F.3d at 1562.[8]  To establish a *prima facie* case, plaintiff must show that either Hayes or Wilson engaged in conduct similar to his or was accused of engaging in conduct similar to or of comparable seriousness to his conduct.

On pages 3-7 of his brief in opposition to summary judgment, plaintiff identifies the evidence that he believes demonstrates that he was similarly situated to Hayes and Wilson.  (See Doc. # 105, p. 3, "Facts Showing that John Toney was Similar[l]y Situated with Elizanne Hayes and Daphne Wilson").  The evidence cited by plaintiff in this portion of his brief in some instances does not support the factual proposition for which plaintiff has cited it.  Even assuming that all the evidence cited by plaintiff had been properly authenticated and considered by the court, and that the facts listed by plaintiff were supported by the cited evidence, the facts he lists do not establish that he is similarly situated to either Hayes or

---

[8]   See also Anderson v. Twitchell-A-Tyco, 76 F. Supp. 2d  1279, 1286 (M.D. Ala. 1999)("'To be deemed 'similarly-situated,' the individual with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.  In determining whether employees are similarly situated for purposes of establishing a *prima facie* case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are [treated or] disciplined in different ways.'")(quoting Malladi v. Brown, 987 F. Supp. 893, 909-10 (M.D. Ala. 1997)).

Wilson.  Plaintiff relies on the following facts:

– Plaintiff, Hayes and Wilson were all shift coordinators supervised by Watts;

– In her February 27, 2003 memorandum to plaintiff regarding transportation issues, Watts tells plaintiff to "continue" to distribute a monthly transportation schedule identifying which ILAs were to transport students, and  plaintiff was already doing this;

– In the same memo, Watts directs plaintiff to provide ILAs with student pick-up information; however, Watts received information regarding required student pick-ups directly from Work-based learning;[9]

– In the same memo, Watts directed plaintiff to "communicate with students (via letter, meeting etc.) their responsibility in the transportation process;" plaintiff communicated with students during their "4;10 meeting" addressing their responsibility;[10]

– In the same memo, Watts directed plaintiff to "develop a tracking system to ensure students were picked up timely (within 30 minutes)"; plaintiff "already had a tracking system in place for the staff to log in the time they left the center and the time they picked up the student," and that "[s]taff was to radio back to the shift coordinator letting him know that

_____

[9]  Plaintiff argues that Watts "would then have that information passed on to the ILAs." (Plaintiff's brief, p. 4).   He does not cite any evidence in support of this contention that Watts performed this job function for the ILAs on his shift.  In her affidavit, Tyra Middleton states that she provides the information to Watts, but does not state that Watts then passes it to the ILAs.  See Plaintiff's Exhibit 24.

[10]   The portion of his own affidavit cited by plaintiff in support of this fact pertains to an August 2003 meeting he held with prime shift ILAs, in which he directed them to make follow-up calls to students who were listed on a placement form.   There is no reference to a meeting with students. (Toney aff., p. 7, l. 11-13).

they have picked up the student" therefore, "[t]here was nothing to change";

– In her April 29, 2003 memo (Defendants' Exhibit 16), Watts asserts that "Plaintiff had missing documents of weekly focus group meetings, minutes of weekly dorm meetings and daily shift change forms, etc.";  however, "Ms. Hayes' shift turned these documents in to Ms. Watts doing the a.m. shift change.  Ms. Parker would take out what she needed and pass the other documents to Ms. Watts.  Ms. Watts some times kept these documents in her office rather than putting them in the binder;"[11]

– the May 11, 2003 written warning for the verbal altercation with McGee "should not have been a write up because the incident did not occur in front of students" and "McG[]ee is known for arguing with co-workers and supervisors;"[12]

– Watts "was not truthful when she said that the Plaintiff did not make proper preparation to have the floors ready"[13] because plaintiff had briefed the acting night shift coordinator, Manora, about "making sure that the floors were clean and ready to be waxed the next day."

---

[11]  The evidence cited by plaintiff does not indicate that the documentation of focus group sessions, dorm meeting minutes, or daily shift change forms referenced in Watts' April 2003 memo were turned in by Hayes' shift, sorted by Parker, or held by Watts in her office.  Plaintiff testified that he found that some of the health and safety inspections were kept in Watts' office.  (Toney depo., pp. 224-25).

[12]  Plaintiff does not state that the verbal altercation did not occur – only that it did not occur in front of students. (Toney aff., p. 7).

[13]  Watts' affidavit states that she had received a complaint from McGee and that "Mr. Toney had not made the proper preparations according to Mr. McGee to allow him to complete the work . . . ."  (Watts aff., p. 3).

19

– With regard to Watt's May 29, 2003 memo regarding equitable use of staff resources, plaintiff states (without citation to evidence) that "staff was being utilized properly. Staff is equally distributed between dorms when possible."

– Plaintiff provided a rebuttal on October 9, 2003, the day he was terminated, to the Center Director complaining about discrimination by Watts; it was not the first time he had complained, but no action had been taken; plaintiff also complained after he had to attend a safety meeting in place of Watts;

– With regard to Defendants' Exhibit 23 (note to Hayes and plaintiff regarding secondary mentoring form), plaintiff was not one of the employees who were listed on the e-mail as having failed to turn in mentoring forms, but Hayes was listed, and plaintiff's mentoring form was turned in ahead of schedule;

– in the performance improvement plan, Watts accused plaintiff of keeping cluttered closets and shared work space (Defendants' Exhibit 21, p. 1), however, plaintiff denies he kept the office cluttered; photographs taken in October 2002, December 2002, and October 2003 show that the office was not cluttered, and Pearson and Moss are in the shift coordinators' office in two of the photographs.

The only comparisons offered by plaintiff to show that he and Wilson are similarly situated are that they are both shift coordinators supervised by Watts. With regard to Hayes, plaintiff adds the additional fact that she failed to turn in her secondary mentoring form, while he had done so ahead of schedule. The remainder of the facts relied on by plaintiff to demonstrate that Wilson and Hayes are similarly situated to him do not appear to have

anything to do with either of these comparators, and they do not demonstrate that either Hayes or Wilson engaged in conduct similar to plaintiff or were accused of engaging in conduct similar to plaintiff.

It is clear that plaintiff disagrees with Watts' negative assessment of his performance and believes that the memoranda she addressed to him concerning perceived performance problems were unwarranted. However – putting Watts' own personal observations of plaintiff's performance deficiencies aside – it is undisputed that Watts received complaints about plaintiff from students and plaintiff's subordinates regarding: (1) plaintiff taking a students' candy, and eating it in front of another student in a taunting manner;[14] (2) work assignments perceived by Pearson to be unfair, and disorganization in transportation scheduling on prime shift;[15] (3) plaintiff's failure to prepare the floors for McGee and yelling at him when McGee complained, and his failure to relieve McGee or Payton so that they could have a lunch break;[16] and (4) requiring Pearson to conduct a new student orientation without adequate training and falsely telling her that a student had complained that she wanted to leave the program because Pearson had told the student that "she should speak when she's spoken to."[17] This latter complaint was made ten days prior to plaintiff's termination. Plaintiff disputes the factual basis for the complaints lodged against him;

---

[14] See Defendants' Exhibits 9-12.

[15] Defendants' Exhibit 8.

[16] Defendants' Exhibit 18.

[17] Defendants' Exhibit 24.

however, he has directed the court to no evidence of record – and the court has found none – indicating that Watts did not believe these complaints to be true.[18]

The record contains evidence that Hayes has also received counseling and memos from Watts for performance problems, that she has previously been given corrective action plans, and that she was given a notice of counseling for failing to report to work without notifying her supervisor. (Watts aff., p. 5; Hayes aff.). A couple of Watts' complaints regarding Hayes' performance are similar to some of the problems Watts contends have been exhibited by plaintiff – specifically, her ILAs "not exhibiting pride in [the] quads and inadequate folder documentation." (Watts aff., p. 5). Additionally, Hayes is included on the memos addressed to all shift coordinators and a few of the memos specifically addressed to Hayes and plaintiff. (Defendants' Exhibits 3, 4, 6, 23, 36, 43). However, there is no evidence in the record that would permit a conclusion that Hayes' overall conduct and job performance was similar to plaintiff's, or that Watts received complaints from staff and students similar in nature to those set forth above with regard to plaintiff.

There is little evidence in the record regarding Wilson. Of the memos filed by defendants, Wilson would have received only one – Watts' October 3, 2003 handwritten note addressed to "shift coordinators" asking them to provide her with time sheets early because

_____

[18] In <u>Jones v. Bessemer Carraway Medical Center</u>, 137 F.3d 1306 (11th Cir.), *superseded in part on other grounds on denial of rehearing*, 151 F.3d 1321 (11th Cir. 1998), the court noted that the plaintiff may establish a *prima facie* case of discrimination by showing: "(1) the plaintiff is a member of a protected class; (2) the plaintiff has engaged – either (a) disputedly or (b) admittedly – in misconduct similar to persons outside the protected class; and (3) that similarly situated, nonminority employees (that is, persons outside the protected class) received more favorable treatment." 137 F.3d at 1311 n. 6.

of a holiday.  (Defendants' Exhibit 43).[19]  Plaintiff has also filed evidence that, after

plaintiff's termination,  Wilson failed to complete her portion of a holiday schedule and the

weekend transportation schedules, that Wilson's shift "also often used one person to monitor

two quads," and that Wilson "called in quite often," more than two days per quarter.  (Warren

aff.).  Plaintiff has not demonstrated that Wilson's conduct or performance was substantially

similar to his.

    Since plaintiff was not replaced by a female and has not identified a female

comparator whose conduct was similar to his or who was the subject of complaints similar

to those lodged against plaintiff, he has not established a *prima facie* case of discriminatory

termination.  See Morris, *supra*, 402 F.3d at 1076 ("Only after the plaintiff has made his

*prima facie* case does the burden shift to the defendant.  Morris never makes it past the first

step of *McDonnell Douglas*.  He has not identified any female physician who replaced him.

 . . . Morris also fails to identify a female physician who received similar complaints

concerning off-color remarks about her patients' ability to have children and who was

accused of conducting forceful physical examinations who was not terminated (or received

favorable treatment).  Without showing that a comparable female received 'nearly identical'

complaints, we cannot adequately compare the Clinic's actions towards Morris and other

female physicians.").[20]  Since plaintiff has failed to establish a *prima facie* case of

---

    [19]  The earlier memos to all shift coordinators predated Wilson's appointment to the shift
coordinator position.

    [20]  Plaintiff relies on the 15-page affidavit of his successor, Damon Warren, who also
complains that he was discriminated against by Watts because he is a male.  (Warren aff.).  Plaintiff

discriminatory termination, defendants are entitled to summary judgment on this claim.

Other Terms and Conditions of Employment

Plaintiff alleges that he "was subjected to disparate treatment in terms and condition[s] of [his] employment with respect to working conditions in that [he] was denied the op[p]ortunity unlike [his] female counterparts to supervise, manage or make decisions about [his] subordinates['] shift[s], schedules and respo[n]sibilities without interference or discipline from [his] supervisor." (Complaint, ¶ 9). Plaintiff has filed a brief that is nearly seventy pages long, with 89 exhibits (some now excluded), including his 372-page deposition. The court has carefully reviewed the record and plaintiff's arguments. Boiled down to its essence, plaintiff's complaint regarding his terms and conditions of employment is that Watts was a nit-picking, overbearing, unpleasant micro-manager who unfairly criticized plaintiff's performance and who undermined his ability to run his shift by remaining at work-site for the duration of his shift, permitting his subordinates to bypass him regarding issues on his shift, and by making decisions plaintiff should have been permitted

---

has also filed the affidavit of James Gooden, who worked under plaintiff's supervision while she was the Program Manager. Gooden perceived that Watts "really had something against males she supervised and males in general." (Gooden aff.). Gooden's affidavit is largely conclusory and references unnamed male staff who had difficulties with Watts. To the extent the affidavit contains any specific facts, those facts do not establish that Gooden was discriminated against by Watts. The same is true of Warren's affidavit. Although his affidavit is lengthy and contains more statements of fact than Gooden's, Warren does not set forth specific facts demonstrating that he was discriminated against. The affidavits do not aid plaintiff in establishing a *prima facie* case, as they include neither direct evidence of discrimination against plaintiff nor evidence that plaintiff was similarly situated to any female treated more favorably. While some of the statements in these affidavits may be relevant to the issue of pretext, the court does not reach that issue because of plaintiff's failure to establish a *prima facie* case.

to make as the shift coordinator.  However, Title VII does not provide a right to a pleasant work environment, but only a right to a workplace that is free of discrimination.

Plaintiff has not established a *prima facie* case of discrimination as to other terms and conditions of employment because the actions about which he complains do not, viewed collectively, constitute an adverse employment action.  See Davis, *supra*.  Additionally, plaintiff has not demonstrated that he is similarly situated to either Hayes or Wilson with respect to these other terms and conditions of employment.  Plaintiff states that, during his entire tenure, Watts worked from approximately 8:00 a.m. until the conclusion of plaintiff's shift at midnight, and that "her constant presence on [his] shift (3:00 p.m. - 12:00 a.m.) caused disruption in the workplace."  (Toney aff., p. 2).  Plaintiff complains that Watts did not spend this much time on the female coordinator's shifts.  With regard to this particular complaint, however – Watts' constant presence and availability to his subordinates for complaints – plaintiff cannot show that he is similarly situated to any other shift coordinator. It is undisputed that Watts routinely worked from 8:00 a.m. until midnight or later.  There were three shift coordinators: one for prime shift (plaintiff), one for night shift (Hall, then Hayes), and one for weekend shift (Hayes, then Wilson).  The prime shift is the only shift that fell within the hours routinely worked by Watts.  Hayes' and Wilson's shifts did not fall within the hours routinely worked by Watts and, therefore, they are not similarly situated to plaintiff.  Plaintiff's suggestion that he has demonstrated disparate treatment because Watts did not also work through the night shift and the weekend shift – or limit her hours to 8:00 through 5:00 – is without merit.  Additionally, even if plaintiff could demonstrate that he was

situated similarly to either Hayes or Wilson with regard to Watts' hours, he has not established that Watts either received complaints from Hayes' and Wilson's subordinates or students similar to those received about plaintiff's management of his shift, or that she responded to any such complaints differently than she did to those lodged against plaintiff.[21] Thus, defendants are entitled to summary judgment on plaintiff's claims that defendant discriminated against him on the basis of his gender with respect to other terms and conditions of employment.

## CONCLUSION

For the foregoing reasons, it is the RECOMMENDATION of the Magistrate Judge that defendant's motion for summary judgment be GRANTED, and that this action be DISMISSED with prejudice.

The Clerk of the Court is ORDERED to file the Recommendation of the Magistrate Judge and to serve a copy on the parties to this action.  The parties are DIRECTED to file any objections to this Recommendation on or before February 20, 2006.  Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation objected to.  Frivolous, conclusive or general objections will not be considered by the District Court.

Failure to file written objections to the proposed findings and recommendations in the

---

[21] In his brief, plaintiff suggests that he was subjected to a "hostile environment" because of Watts' continual presence during his shift.  (Plaintiff's brief, p. 7).  Plaintiff does not allege facts in his complaint in support of a hostile environment claim, and asserts no such claim.  Even if he had brought a hostile environment claim, however, the evidence does not demonstrate the existence of a genuine issue of material fact regarding whether plaintiff suffered gender-based harassment that was sufficiently severe or pervasive to alter the terms and conditions of his employment.

Magistrate Judge's report shall bar the party from a *de novo* determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice.  Resolution Trust Co. v. Hallmark Builders, Inc., 996 F.2d 1144, 1149 (11th Cir. 1993); Henley v. Johnson, 885 F.2d 790, 794 (11th Cir. 1989).

Done, this 6th day of February, 2006.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
UNITED STATES MAGISTRATE JUDGE